# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| SANDY BRITO GONZALEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:17-CV-00144 |
| ) | Judge Aleta A. Trauger |
| AIMBRIDGE HOSPITALITY, LLC, ) | |
| D/B/A EMBASSY SUITES, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

Aimbridge Hospitality, LLC d/b/a Embassy Suites has filed a Motion for Summary Judgment (Docket No. 12), to which Sandy Brito Gonzalez has filed a Response (Docket No. 19), and Embassy Suites has filed a Reply (Docket No. 29). For the reasons set out herein, Embassy Suites' Motion will be granted in part and denied in part.

## I. BACKGROUND AND PROCEDURAL HISTORY

Gonzalez worked as a maintenance engineer at an Embassy Suites hotel in Nashville from August 17, 2015, to January 14, 2016. (Docket No. 22 ¶ 1.) He is a Hispanic man of Cuban national origin. (*Id.* ¶ 2.) He was part of an eight-person engineering department, six of whom were classified as maintenance engineers. Of the other five maintenance engineers, two were Hispanic or Latino, two were White, and one was Black. The chief engineer, Lanny Dunlap, was White. (*Id.* ¶¶ 7–8.) The fact that Gonzalez was of Cuban origin was widely known among hotel employees and management. (*Id.* ¶¶ 5–6.) The hotel's director of human resources, Megan Ray, testified that the decision to hire Gonzalez was made by Dunlap, along with Ray's predecessor in human resources. (Docket No. 27 at 13.) Gonzalez disputes that characterization and testified

that, when he interviewed for the job, he dealt briefly with Dunlap but also met with General Manager Rone Middler. (Docket No. 26 at 23.)

Maintenance engineers worked in two shifts: a "first shift" from 7:00 a.m. to 3:00 p.m. and a "second shift" from 2:30 p.m. to 11:00 p.m. Gonzalez worked the second shift. (Docket No. 22 ¶¶ 4, 12.) Each maintenance engineer was required to maintain a detailed log of the maintenance calls he made during his shift, including a record of which rooms he accessed. (*Id.* ¶ 15.) Embassy Suites' Employee Handbook included a provision regarding improper access or use of rooms:

> **HOUSE RULES**
> **An employee may be immediately terminated, without previous warning, for violating any of the following house rules:**
>
> . . .
>
> **Unauthorized Outlet Use:** Unauthorized use of guest rooms or guest facilities. Unauthorized presence at guest functions or in guest areas, including (but not limited to) guest rooms, restaurants, bars, lounges or meeting rooms.

(*Id.* ¶ 20.)

Rooms in the hotel were accessible by electronic keys, and hotel employees had individual "grand master" keys that allowed them to enter the rooms if needed. Any time a key was used to access a room, the date, time, and unique key number were stored in the hotel's electronic data. (*Id.* ¶¶ 32, 34.) The Handbook included the following provisions regarding "key control":

> **KEY CONTROL**
>
> The Safety and security of our employees, our guests and our assets are based on sound practices and controls of all keys issued to guests, employees and outside vendors for repair/maintenance/installation of equipment.
> - Employees must sign for all keys issued to them during their shift
> - Keys issued to an employee must remain in the employee's possession
> - Employees should never give or loan their key to another employee

- Employees must immediately report the loss or damage of an assigned key
- Employees are never permitted to leave the building with their assigned keys
- Employees must sign all keys issued to them back in before leaving the hotel
- EMPLOYEES ARE NEVER TO OPEN A DOOR FOR A GUEST WHO CLAIMS TO HAVE LOST THEIR KEY. They must be sent to the Front Desk to secure another key.

> Any lost key needs to be reported immediately. The Manager of the Department must report the lost key to the General Manager or Security immediately. If a Grand Master or Emergency Master or Section Key is lost, all rooms must be re-keyed or re-programmed as quickly as possible. An incident report must be completed with all the information and the time of the loss and the time of the re-keying completed. If the key is lost due to negligence[,] is not reported timely[, or the loss] is a second offense then the employee responsible should be suspended pending investigation. Suspension may lead to disciplinary action up to and including dismissal.

(*Id.* ¶ 22.) Gonzalez's grand master key was number 68. (*Id.* ¶ 37.)

While he was working at Embassy Suites in Nashville, Gonzalez lived in an apartment in Franklin. He decided to look for an apartment in Nashville to eliminate the need for a lengthy commute. In December 2015, he asked hotel management whether he could rent a room at the hotel itself while he looked for a Nashville apartment and waited for his Franklin lease to expire. General Manager Middler told Gonzalez that the rental rate would be $54 per day plus taxes. Citing the expense, Gonzalez declined the opportunity to rent a room at the hotel. (*Id.* ¶¶ 23–28.)

On January 14, 2016, management began to suspect, based on physical clues, that someone had been sleeping in one or more of the hotel's out-of-order rooms. (*Id.* ¶ 29.) Director of Human Resources Ray discussed the matter with Chief Engineer Dunlap, and they decided to run "interrogation reports"—compiled reports of key usage data—for each of the hotel's out-of-service rooms. (*Id.* ¶ 38.) The interrogation reports showed that, the night before, January 13, 2016, Gonzalez's unique key had been used to access one of the out-of-service rooms, Room 921. (*Id.* ¶ 41.) No other key had been used to access Room 921 on that day. (*Id.* ¶ 42.) Ray

3

testified that she reviewed Gonzalez's log of maintenance calls and found no corresponding legitimate reason for having accessed the room. (*Id.* ¶ 40.) Gonzalez, however, testified that he went into Room 921 on January 13, 2016, because he had been instructed to swap a clean couch cushion from that out-of-service room with a dirty couch cushion from an in-service room, Room 913. (Docket No. 26 at 94–96.) He explained that, because he did not actually do any work in Room 921, he did not record his entering it on his call log. (*Id.*)

Gonzalez also disputes whether the interrogation report correctly reflects the time that he entered the room. The report shows that Gonzalez's key was used to access Room 921 at an "unadjusted" time of 11:29 p.m. (Docket No. 26-9 at 1.) According to the report, however, the times on the report "are adjusted to reflect the terminal's date & time at the time of the interrogation or before clock programming." The "adjusted" time for Gonzalez's entry into Room 921, according to the report, was 10:15 p.m. (*Id.*) It is, therefore, not entirely clear from the face of the report whether Gonzalez accessed the room shortly before or shortly after the end of his shift. (*Id.*) His time card for that day showed him as having clocked out at 11:14. (Docket No. 22 ¶ 45.)

Ray generated interrogation reports for Room 921 and another out-of-service room, Room 429, for a number of additional dates. (*Id.* ¶ 46.) The Room 921 report showed that Gonzalez had entered Room 921 a few times on January 7, 2016, including late in the day. (Docket No. 26-9 at 2.) Gonzalez, however, notes that that entry, as well, has an issue with regard to adjusted and non-adjusted times. He also contends that he again had a valid reason for going into the room. He has produced what he has identified as his personal call log—a handwritten document separate from his official call log—showing that, on that date, he had an air conditioning-related call in an adjacent room, Room 922. Gonzalez has explained that

4

performing the relevant type of air conditioning work required the engineer to access the air conditioning valves from the adjoining room. (Docket No. 24 at 3; Docket No. 26 at 91.) Embassy Suites' official call logs also show that Gonzalez performed air conditioning work in Room 922 on that day. (Docket No. 26-11 at 5.)

The interrogation reports further showed that Gonzalez accessed Room 921 on January 10, 2016. (Docket No. 22 ¶ 51.) Embassy Suites has produced a call log for that date showing no legitimate purpose for visiting that room. (Docket No. 26-11 at 4.) Gonzalez, however, insists that the logs have been doctored. Specifically, he notes that there is a log, ostensibly for January 11, 2016, where the date has visibly been altered from "1/10/16" to "1/11/16." (*Id.* at 3.) That call log does show air conditioning work done in Room 922—which, as Gonzalez explained, would have required him to access the valves through Room 921. (Docket No. 24 at 3; Docket No. 26 at 88.) A side-by-side comparison of the Embassy Suites call logs and Gonzalez's own unofficial log confirms that the work that one log attributes to January 10 is attributed, on the other log, to January 11, and vice versa. (*Compare* Docket No. 24 at 3 *with* Docket No 26-11 at 3–4.) The handwritten date on the Embassy Suites version for January 11, moreover, does appear clearly to have been changed (or contemporaneously corrected), with a "0" having been scribbled over to create a thick "1." (Docket No. 26-11 at 3.) The Embassy Suites version of the January 10 log does not have a clear alteration, but it is conceivable that a more subtle alteration could have been sufficient, with the single vertical line that Gonzalez uses for "1" being used as one of the sides of the "0." (*Id.* at 4.)

On January 11, 2016, according to the interrogation reports, Gonzalez accessed the out-of-service Room 429. (Docket No. 22 ¶ 55.) This entry exhibits the same issues that Gonzalez has identified with regard to the others. The adjusted-versus-unadjusted time discrepancy makes

5

it unclear whether Gonzalez accessed the room during or after his shift. (Docket No. 26-10 at 2.) His personal call log shows him as having a legitimate task in that room on January 11, but Embassy Suites' version places that call on January 10. (*Compare* Docket No. 24 at 3 *with* Docket No 26-11 at 4.)

The January 12, 2016 interrogation report shows him accessing Room 921 late in the day. (Docket No. 26-9 at 2.) He has not identified any call log entry explaining that instance but has testified that he merely went into the room, at the direction of the front desk, to see if it was ready. As with his accessing the room on January 13, 2016, he explained the lack of a log entry by explaining that he did not make one because he did not actually perform any work in the room. (Docket No. 26 at 94.) Again, the adjusted time shows him having accessed the room during his shift, while the unadjusted time shows him having done so after the shift had ended. (Docket No. 26-9 at 2.)

Ray pulled security camera footage to see if Gonzalez left the hotel on the nights in question. (Docket No. 22 ¶ 63.) She testified that, on one of the days in question, one camera appeared to show Gonzalez leaving the parking lot in his car, but another camera later showed what she believed to be his car returning to the hotel that same night. She was not, however, able to produce the video, which, she testified, had been erased. (Docket No. 27 at 47–49.) Gonzalez had produced a Declaration by his girlfriend, Virginia Davis, who lived with him in his apartment in Franklin. Davis states that Gonzalez returned home and slept in their apartment every day while he was working at Embassy Suites. (Docket No. 25.)

On January 14, 2016, Ray and Dunlap met with Gonzalez and informed him that it appeared, to them, that he had been accessing several out-of-service rooms near the end of his shift without a legitimate reason. (Docket No. 22 ¶ 66.) Gonzalez initially claimed that he had

lost his key, so he could not have been using it to enter the rooms. He quickly admitted, however, that that was incorrect. Next, he argued that the times being shown for his entry into the rooms must have been in error. (*Id.* ¶¶ 67–69.) In response, Ray used Gonzalez's key on the lock of Room 429 and checked the time against the time reflected in the hotel's data. The data showed the correct time, without the need for adjustment. (*Id.* ¶ 70.) As Gonzalez points out, however, the interrogation report also reflects that the Room 429 lock was accessed on January 13, 2016, with a "clock change key," and the lock's clock time appears to have been corrected to eliminate the need for adjustment. (Docket No. 26-10 at 1.) Therefore, a discrepancy that would have affected the entries from January 10 through 12 would no longer have shown up on January 14. Gonzalez suggests that Dunlap altered the call logs and fixed the lock times specifically to set Gonzalez up for improperly sleeping in the Embassy Suites rooms, which he had never done. (Docket No. 22 ¶ 70.)

Despite Gonzalez's denials, he was terminated. Embassy Suites maintains that the decision to terminate him was made by Dunlap and Ray together, whereas Gonzalez attributes the decision to Dunlap. (*Id.* ¶ 72.) Eventually, on March 16, 2016, Embassy Suites hired Jose Luis Bermello, another Hispanic man, to fill Gonzalez's former position. (*Id.* ¶¶ 73–74.) Embassy Suites claims that Bermello is of Cuban national origin. (*Id.* ¶ 75.) In support of that contention, the hotel initially offered a screenshot of what appears to be Bermello's Facebook profile. (Docket No. 15-13.) The profile states that Bermello works at Embassy Suites and is "[f]rom Havana, Cuba." (*Id.*) After a hearsay objection by Gonzalez, Embassy Suites offered a Declaration by Ray asserting that Bermello is of Cuban national origin. (Docket No. 30-1.)

Gonzalez testified that he had heard of other employees violating the unauthorized access policy, including an engineer of Egyptian national origin known as "Shawkie." He was not,

7

however, able to provide any evidence of Shawkie's activities other than what he had heard from other engineering employees. (Docket No. 22 ¶¶ 91–96.) He also identifies another Hispanic engineer, Marcos Collado, who allegedly improperly used a guest room's bathroom without flushing but was not terminated. (*Id.* ¶¶ 76, 97–100.) Gonzalez concedes that he does not know Collado's country of origin. (*Id.* ¶ 100.) Finally, with regard to the rooms that Gonzalez was accused of accessing, he notes that they were also accessed by (1) a Caucasian laundry supervisor named "Angela," and (2) an unidentified employee with master key #50. (*Id.* ¶ 76.) He concedes, however, that he does not know whether Angela's access was during her shift or not. (*Id.* ¶¶ 79–81.)

Gonzalez has identified a number of incidents that, he argues, demonstrate Dunlap's hostility to him based on his race or national origin. After a December 22, 2015 meeting, Ray asked Gonzalez a question about his beard, and Dunlap interjected to describe the beard as a "Latin landing strip." (*Id.* ¶ 101.) Dunlap also referred to Gonzalez as a "Latin lover" and made accompanying suggestive gestures. (*Id.* ¶ 102.) Gonzalez also states that Dunlap has referred to him as "Speedy Gonzales" and would shout "Andale! Andale!" at him. (*Id.* ¶ 109.) Gonzalez testified that Dunlap never trained him adequately and sometimes required him to do menial tasks that other maintenance engineers were not required to do, such as scrubbing pool tiles on his hands and knees. (Docket No. 26 at 113.) Gonzalez also attributes a number of sexually explicit comments to Dunlap over the time Gonzalez worked at Embassy Suites. (Docket No. 22 ¶¶ 107–08, 114–15.) Finally, Gonzalez has filed a Declaration stating that Dunlap frequently referred to him as "Castro" or "Fidel" and, in a number of instances, instructed him to speak English, because "we are in America." (Docket No. 24 at 1.)

8

After availing himself of the Equal Employment Opportunity Commission process and receiving a Notice of Right to Sue, Gonzalez filed his Complaint in this case on January 19, 2017, pleading one count of discrimination based on race, national origin, and/or sex in violation of Title VII. The claim alleged discrimination both with regard to his termination and with regard to Embassy Suites' alleged creation of hostile work environment predicated on Gonzalez's race, national origin, and gender. (Docket No. 1 ¶¶ 19–22.) Embassy Suites now seeks summary judgment. (Docket No. 12.)

## **II. LEGAL STANDARD**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252 (1986). An

issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

A plaintiff may prove unlawful discrimination by proffering either direct or indirect evidence. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016). In this case, the plaintiff proffers indirect evidence. To analyze Title VII claims using indirect evidence, the Sixth Circuit applies the burden-shifting approach established by the *McDonnell Douglas* line of cases. *Id.*; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under this approach, Gonzalez must first establish the elements of a *prima facie* case. To do so, he must show that he was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and (4) replaced by a person outside the protected class or treated differently than similarly-situated employees outside the protected class. *Tennial*, 840 F.3d at 302 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). Only if Gonzalez can establish these elements does the burden shift to Embassy Suites to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.

Embassy Suites has conceded the first three elements. Gonzalez, who claims nation-of-origin discrimination based on his status as a native of Cuba,[1] is a member of a protected class; his termination was an adverse employment action; and he was qualified for the position that he had been performing, apparently without significant incident, before the events leading to his

---

[1] In his Complaint, Gonzalez also raises claims of discrimination based on race and sex. In his Response, he concedes that he cannot establish a claim based on sex or gender. The analysis of the race discrimination claim, insofar as he still pursues such a claim, would be the same, in this case, as with regard to his claim based on national origin, except for the fact that Gonzalez would be unable to rely on a non-Cuban Hispanic employee as a comparator under the fourth *McDonnell Douglas* factor.

10

termination. Embassy Suites focuses, therefore, on the fourth element—whether Gonzalez was treated differently than similarly situated employees outside his suspect class.

Embassy Suites points out that, although Gonzalez's position remained open for about two months after his termination, he was eventually replaced by Bermello, who, Embassy Suites maintains, is also from Cuba. Gonzalez admits that Bermello is a Hispanic male, but he disputes Embassy Suites' assertion that Bermello is of Cuban national origin. (Docket No. 22 ¶ 75.) Gonzalez does not posit an alternate nation of origin for Bermello or cite to any evidence that Bermello is not from Cuba; instead, he relies solely on an evidentiary objection, arguing that Embassy Suites' assertion "is based upon inadmissible hearsay," namely, a Facebook page. (*Id.* ¶ 75.)

A summary judgment movant facing an objection on admissibility grounds can overcome that objection by "explain[ing] the admissible form that is anticipated" for presenting the relevant fact at trial. *Mangum v. Repp*, 674 F. App'x 531, 536 (6th Cir. 2017) (quoting Fed. R. Civ. P. 56(c), advisory committee's note to 2010 amendment); *see also Mount Vernon Fire Ins. Co. v. Liem Constr., Inc.*, No. 3:16-CV-00689, 2017 WL 1489082, at *3 (M.D. Tenn. April 26, 2017) (Crenshaw, J.) (acknowledging that the court, on a summary judgment motion, may consider evidence presented in hearsay form if the evidence can be reduced to admissible form at trial); *Wilson v. Stein Mart, Inc.*, No. 3:15-CV-01271, 2016 WL 4680008, at *2 (M.D. Tenn. Sept. 7, 2016) (Nixon, S.J.) (same); Jeffrey W. Stempel et al., 11-56 Moore's Federal Practice - Civil § 56.91 (2018) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . , the material may be presented in a form that would not, in itself, be admissible at trial."). Embassy Suites responded to Gonzalez's objection by filing a Declaration of Megan Ray, stating that she is "familiar with Mr. Bermello's

11

race and national origin through [her] own observations and experiences working with him," and Bermello is from Cuba. (Docket No. 30-1.) Although Ray's language is vague, it appears likely that her statement, at least with regard to Bermello's nation of origin, is based on embedded hearsay. It is possible that she got her information from some source that would fall into a hearsay exception, but her declaration offers no grounds for drawing such a conclusion. Embassy Suites, therefore, has failed to establish a lack of disputed material fact, supported by admissible evidence, regarding Bermello's nation of origin.

Embassy Suites' failure to support its claim that Bermello is from Cuba is not, however, necessarily fatal, because the burden of establishing that he has adequate evidence to make his *prima facie* case is, as Embassy Suites correctly points out, on Gonzalez. *See Hooker v. City of Toledo*, 644 F. App'x 675, 676–77 (6th Cir. 2016) ("[I]f the nonmoving party failed to make a sufficient showing on an essential element of the case with respect to which the non-movant has the burden, the moving party is entitled to summary judgment as a matter of law.") (citing *Celotex*, 477 U.S. at 322–23). Just as Embassy Suites has offered no admissible evidence to establish that Bermello was from Cuba, Gonzalez has offered no evidence from which a fact finder could conclude that he was not. Gonzalez, therefore, has not established that he can make his *prima facie* case based on Bermello alone.

Bermello, however, is not Gonzalez's only option. Gonzalez argues that, even if he was not replaced by a person outside his protected class, he was treated differently than similarly situated non-Cuban/non-Hispanic employees, because, unlike his peers, he "was falsely accused of violating the Unauthorized Outlet Use portion of the Hotel's House Rules, his daily log sheets were falsified, and the door lock timing mechanism was manipulated to support the termination decision." (Docket No. 21 at 10.) He notes that no such actions were taken against his non-

12

Cuban colleagues, specifically, three other maintenance engineers: Jeffrey Kendrick, Cecil Hargis, and Dimitrije Kovac, on whom he relies as comparators in lieu of Shawkie, Collado, or Angela. (*Id.*)

Under Sixth Circuit law, to establish that he was treated differently than similarly-situated employees, Gonzalez must show that he and his proposed comparators were similar in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). Typically, when a termination was disciplinary in nature, a plaintiff must show that his proposed comparators engaged in acts of comparable seriousness. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (emphasis omitted) (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)). Gonzalez, however, maintains that he did not engage in *any* wrongdoing. He has, moreover, presented ample evidence to establish a disputed issue of fact in that regard. His girlfriend states that he never stayed overnight at the hotel; he has presented documentary evidence suggesting that his logs may have been altered; and he has raised legitimate questions about the hotel's records regarding when he accessed the rooms at issue. In short, someone—either Gonzalez or someone at Embassy Suites, like Dunlap—has gone to significant lengths to falsify a version of the events leading to the termination, and the facts before the court do not establish which party is telling the truth. Because Gonzalez is the party opposing summary judgment, the court must resolve those disputed issues of material fact in his favor. Accordingly, he does not need to identify a comparator who actually violated the same rule that he was accused of violating. Under the facts alleged by Gonzalez, the most appropriate comparator would be an otherwise comparable employee who had *not* violated the policy, but who, like Gonzalez, was vulnerable to being framed by Dunlap for such a violation. *See Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) (suggesting that the plaintiff may have

identified appropriate comparators by identifying employees who, unlike her, were not falsely accused of particular wrongdoing, before resolving the case on other grounds).

Embassy Suites has offered no reason why the other maintenance engineers—including Kendrick, Hargis, and Kovac—were not equally vulnerable to being framed by Dunlap for some misconduct of comparable seriousness. Admittedly, the specific allegations against Gonzalez depended on Gonzalez's having entered out-of-service rooms, for legitimate reasons, at particular times near the end of his shift. As Gonzalez explained, however, there were numerous legitimate purposes for which entering such a room would be necessary. There is no reason to conclude that Gonzalez was the only maintenance engineer who ever had such a reason during the latter hours of his shift. The discrepancies in the lock clocks and the fact that call logs were vulnerable to physical alteration by management meant that any maintenance engineer was vulnerable to false allegations of unauthorized use of a room. Gonzalez's colleagues who were not Cuban, accordingly, are appropriate comparators.

Moreover, Gonzalez's showing is bolstered by "other direct, indirect, or circumstantial evidence supporting an inference of discrimination." *Braithwaite v. Dep't of Homeland Sec.*, 473 F. App'x 405, 412 (6th Cir. 2012) (quoting *Ercegovich*, 154 F.3d at 352); *cf. Henry v. Shawnee Specialties, Inc.*, No. 1:14-CV-1234, 2016 WL 1253041, at *4 (W.D. Mich. Mar. 31, 2016) (looking to additional circumstantial evidence to shift the burden under *McDonnell Douglas*, despite the fact that the plaintiff, who alleged that he was falsely accused of poor performance, had failed to identify an appropriate comparator). Gonzalez has plausibly alleged what amounts to an egregious attempt by Dunlap, if true, to frame him of violating the room access policy. That Dunlap would allegedly go to such lengths to manufacture a ground for terminating Gonzalez suggests, at the very least, that Dunlap harbored some kind of significant personal animus against

Gonzalez. Dunlap's own behavior and comments, moreover, raise a legitimate basis for inferring that Gonzalez's race or national origin was at the heart of that animus.

Embassy Suites responds to this evidence by arguing that Dunlap's nondiscriminatory motives are supported by the "'same actor' inference," a line of reasoning that, the Sixth Circuit has recognized, "allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995). That inference, though, is "by no means a mandatory one, and it may be weakened by other evidence." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003) (citing *Buhrmaster*, 61 F.3d at 464). Moreover, Gonzalez has identified testimony that calls into doubt the degree to which Dunlap was actually the key decision maker regarding his hiring. General Manager Miller also appears to have been involved in Gonzalez's hiring and would, presumably, have had sway over Dunlap's decision. Even Ray concedes that her predecessor in human resources was involved in the decision. There is reason, then, to doubt that the fact of Gonzalez's hiring provides much of a window into Dunlap's thinking or attitudes— especially since Dunlap has allegedly provided a more direct glimpse of those attitudes through his comments to and treatment of Gonzalez. The court, accordingly, will conclude that Gonzalez has presented enough comparator evidence and supportive circumstantial evidence to shift the burden to Embassy Suites to identify the legitimate nondiscriminatory reason for his termination.

Embassy Suites, as expected, argues that Gonzalez was terminated for his violation of the hotel's policy against improper access and use of rooms. Embassy Suites argues, moreover, that, under the Sixth Circuit's "honest belief rule," Gonzalez's purported violations are a sufficient ground to support his termination even if Gonzalez was, in fact, innocent. Pursuant to that rule, "an employer's proffered reason is considered honestly held"—and is, therefore, sufficient to

defeat a discrimination claim—"where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)). To overcome an employer's honest belief, a plaintiff must show "more than a dispute over the facts upon which the discharge was based." *Seeger*, 681 F.3d at 285 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)). The employer's decision-making process is not required to have been "optimal or [to have left] no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998); *see also Tibbs v. Calvary United Methodist Church*, 505 F. App'x 508, 514 (6th Cir. 2012) (applying honest belief rule and finding that employer was entitled to summary judgment, where employer "made its termination decision based on particularized facts," the "decision to fire [the plaintiff] was not so questionable that it might be deemed unworthy of credence," and employer made a "reasonably informed and considered decision").

Embassy Suites' argument, in essence, is that the court should ignore all of the alleged bad faith on behalf of Dunlap and credit Embassy Suites with the assumed good faith of Ray. Embassy Suites' own internal documentation of the termination, however, is signed by Dunlap as the "Manager" and by Ray only as the "Witness." (Docket No. 27-6 at 2.) When Ray was asked whose decision it was to fire Gonzalez, she responded, "It was my—mine as well as Lanny's." (Docket No. 27 at 64.) The evidence, therefore, strongly suggests that Dunlap was central to the termination decision. As the court has already discussed, Gonzalez has raised genuinely disputed issues of material fact with regard to whether Dunlap engaged in an

16

affirmative effort to falsify evidence of Gonzalez's wrongdoing. That is enough to overcome any claim that Embassy Suites acted on an honest belief that Gonzalez had violated its policies and is also enough to allow a reasonable fact finder to conclude that Gonzalez has established pretext. The court, accordingly, will deny Embassy Suites' motion for summary judgment with regard to Gonzalez's claim for race or national origin discrimination related to his termination.

Gonzalez has also argued, however, that he can establish a claim of national origin harassment, because Dunlop's inappropriate workplace behavior created a hostile work environment in the time leading up to Gonzalez's termination. Under well-established Supreme Court precedent, a hostile work environment occurs only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Determining whether an environment is hostile or abusive requires "looking at all the circumstances" and considering factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees' work performance." *Id.* at 23. Moreover, the conduct must be so severe or pervasive that an objectively reasonable person would find it abusive in addition to the plaintiff's subjectively perceiving it as such. *Id.* at 21; *see also Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007) (noting that the federal courts are "generally not in the business of refereeing . . . common workplace conflicts").

The comments and actions alleged by Gonzalez are simply not sufficiently severe or pervasive to rise to the level of actionable harassment. While Gonzalez argues that inappropriate behavior by Dunlap was common, he has only detailed a handful of incidents, some of which

17

were not directed at Gonzalez in particular and did not have any apparent racial or ethnic component. While Dunlap's behavior may have been boorish, unprofessional, and, at times, racially inappropriate, it was not, based on its severity and frequency, such that a jury could conclude that an objectively reasonable person would consider it so abusive that it rose to the level of altering the terms or conditions of employment. Embassy Suites' Motion for Summary Judgment, therefore, will be granted with regard to the harassment claim.

## IV. CONCLUSION

For the foregoing reasons, Embassy Suites' Motion for Summary Judgment (Docket No. 12) is hereby **GRANTED** in part and **DENIED** in part. Embassy Suites is granted summary judgment on Gonzalez's claims for discrimination on the basis of sex related to his termination and harassment on the basis of sex, race, or national origin. Gonzalez's claims for race and national origin discrimination based on his termination remain for trial.

It is so **ORDERED**.

ENTER this 6th day of July 2018.

 _____
 ALETA A. TRAUGER
 United States District Judge